**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| FLORIDA FOUNDATION SEED PRODUCERS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:10-CV-125 (WLS) |
| | : | |
| GEORGIA FARMS SERVICES, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**ORDER**

Presently pending before the Court is Plaintiff Florida Foundation Seed Producers, Inc.'s Motion for Partial Summary Judgment (Doc. 111), Defendants Georgia Farm Services, LLC's ("GFS"), William Douglas Wingate ("Wingate"), and Great Southern Peanut's ("GSP") (collectively referred to as "Defendants") Motion for Summary Judgment (Doc. 109), and Third Party Defendants Georgia Crop Improvement Association, Inc.'s ("GCIA") Motion for Summary Judgment (Doc. 118). For the following reasons, Plaintiff's Motion for Partial Summary Judgment (Doc. 111) is **GRANTED-IN-PART** and **DENIED-IN-PART**, Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and GCIA's Motion for Summary Judgment (Doc. 118) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**PROCEDURAL HISTORY**

On September 23, 2010, Plaintiff filed this action against Wingate and GFS, alleging infringement of a plant variety protection certificate and breach of contract. (Doc. 1). On October 15, 2010, Wingate and GFS filed their Answer and a Third Party Complaint against

GCIA, alleging tortious interference with business relations, fraud, and negligent misrepresentation. (Doc. 11). On April 5, 2011, Plaintiff filed an Amended Complaint alleging infringement of a plant variety protection certificate against Wingate, GFS, and GSP, breach of contract against GFS, conversion against all Defendants, and unjust enrichment against all Defendants (Doc. 37). On April 19, 2011, Defendants GFS, GSP, and Wingate filed their Answer to the Amended Complaint and a Third Party Complaint against GCIA. (Doc 44).

On October 31, 2011, all three parties in the suit filed Motions for Summary Judgment. Because each motion contains inter-related arguments, the Court will consider them together. All parties have filed their respective responses and replies, and the Motions for Summary Judgment are fully briefed and ripe for ruling.

## FACTUAL SUMMARY

The following summary of relevant facts contains the undisputed facts derived from the Complaint (Doc. 1), Defendants' Answer and Third Party Complaint (Doc. 11), GCIA's Answer (Doc. 22), the Amended Complaint (Doc. 37), Defendants' Answer to the Amended Complaint and Third Party Complaint (Doc. 44), GCIA's Answer (Doc. 45), Defendants' Rule 56 Statement (Doc. 110), Plaintiff's Response to Defendants' Rule 56 Statement (Doc. 138), Defendants' Response to Plaintiff's Response to Defendants' Rule 56 Statement (Doc. 155), Plaintiff's Rule 56 Statement (Doc. 111), Defendants' Response to Plaintiff's Rule 56 Statement (Doc. 145), Plaintiff's Response to Defendant's Response to Plaintiff's Rule 56 Statement (Doc. 163), GCIA's Rule 56 Statement (Doc. 119), and Defendants' Response to GCIA's Rule 56 Statement (Doc. 147), which were submitted pursuant to Local Rule 56.[1]  Where relevant, the factual

---

[1]     Local Rule 56 states:

The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant

summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to the nonmoving party.  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56.

Dr. Daniel Gorbet and Dr. Barry Tillman are plant breeders for the Florida Agricultural Experiment Station of the University of Florida. Gorbet and Tillman specialize in peanut breeding and peanut genetics. After several years of research, Gorbet and Tillman developed a new variety of peanuts which they named "Florida-07."  (Doc. 116-2 at 4, 10).  The United States Department of Agriculture issued Plant Variety Certificate No. 200800069 ('069 Certificate) for the Florida-07 variety to the Florida Agricultural Experiment Station on June 5, 2008.  (Doc. 111-1 at 1-16).   The Certificate requires all sales of Florida-07 peanut seed to be only of a class of certified seed.  (*Id.* at 1-2; Doc. 115-2 at 96-97).  Gorbet and Tillman assigned their entire interest in the Florida-07 variety to the University of Florida Board of Trustees (UFBT), the legal body of the Florida Agricultural Experiment Station in January 2008.  (Doc. 116-2 at 2, 7; Doc. 115-2 at 96-98).  UFBT released the Florida-07 variety to Florida Foundation

---

contends there is no genuine issue to be tried.  Each material fact shall be numbered separately. Statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court.  Affidavits and the introductory portions of briefs do not constitute a statement of material facts.

The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(f) of the Federal Rules of Civil Procedure.

All documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the court. Where possible, dates, specific page numbers, and line numbers shall be given.

M.D. Ga. R. 56.

Seed Producers, Inc. ("FFSP") for seed increase and licensing, and assigned its entire interest in the variety to FFSP in September 2010.  (Doc. 116-2 at 9).  FFSP is a non-profit corporation organized under the laws of the State of Florida with its principal place of business at 3913 Highway 71, Marianna, FL 32446.  FFSP is a statutory direct-support organization of the Florida Agricultural Experiment Station of the University of Florida.  (*Id.*; Doc. 115-2 at 92-95; *see also* F.S.A. § 1004.28).  FFSP licenses the Florida-07 variety to peanut seed producers under a limited license which authorizes the producer to propagate and sell classes of certified peanut seed to peanut growers.  (Doc. 116-2 at 9).  Among other things, the license prohibits the use of the Florida-07 variety for any other purpose without express written permission of FFSP.  (Doc. 124 at 1).  The license also mandates that all Florida-07 peanut seed be sold *only* as a class of certified seed.  (*Id.*)

All seed bags of Florida-07 peanut seed sold by FFSP were labeled, and continue to be labeled, with the notice "Unauthorized Propagation Prohibited," and that the seed was a U.S. protected variety pursuant to 7 U.S.C. § 2567.  (Doc. 116-2 at 9-10).  All seed bags of Florida-07 peanut seed sold by FFSP were labeled, and continue to be labeled with notice that the seed is also protected by U.S. Patent Nos. 6,063,984, 6,121,472, and 5,922,390 ("High Oleic patents"). (*Id.*)

Defendant, Georgia Farm Services, LLC ("GFS"), is a Georgia limited liability company. (Doc. 115-2 at 103-06).  In early 2009, Doug Wingate, Mary Wingate, Brenda Notterman, and Alan Wingate  created a limited liability company, Great Southern Peanut, LLC ("GSP"). (Wingate Decl at 4). Defendant, William Douglas Wingate ("Wingate"), is the managing member of GFS and GSP.  (Doc. 111-1 at 17-20; Doc. 115-2 at 2).  In January 2009, Wingate

executed the limited license referred to as the "Seed Agreement for Florida-07 Peanut Cultivar," on behalf of GFS ("Seed Agreement" or "license").  (Doc. 111-1 at 27-29, 76-77).

The Seed Agreement authorized GFS to "propagate, market, and sell seed of the "Licensed Plant Material," the Florida-07 peanut cultivar.  (Doc. 124 at 1).  The license also imposed the following limitations and conditions: (1) It prohibited GFS from using the Florida-07 variety for any other purpose without express written permission of FFSP; (2) It required that all Florida-07 peanut seed be sold "only as a class of Certified Seed and tagged as such."; (3) It required GFS to label seed bags and sales invoices with express notices that Florida-07 peanuts were protected by the '069 Certificate, three U.S. Patents, and that the variety could not be saved for replanting; and (4) GFS was also required to secure an "Acknowledgement of Intellectual Property" from farmers who purchased Florida-07 peanut seed so that they would be fully aware of the federally protected status of the variety.  (*Id.*)

In May 2009, FFSP supplied 75,000 pounds of foundation class Florida-07 peanut seed to GFS for it to propagate Florida-07 peanut seed under the Seed Agreement.  (Doc. 111-1 at 29-30; 77-85).  That seed was identified as Florida-07 variety on the seed bags and in invoices provided to GFS.  (*Id.*)  After receiving the foundation seed from FFSP, GFS verbally contracted with four growers, Clenny Family Farms, Summerlin Farms, Pope Land Company, and Merle Smith, ("Seed Growers") for the propagation of the Florida-07 seed crop.  (Doc. 111-1 at 29-36; 77-97).  GFS did not obtain an "Acknowledgement of Intellectual Property" (also referred to as Appendix B to the Seed Agreement) from any of the four Seed Growers.  (*Id.* at 46-47).

GFS entered each Seed Growers' Florida-07 acreage into the Georgia seed certification program with the Georgia Crop Improvement Association, Inc. ("GCIA").  (*Id.*  at 35-36, 40-41; Doc. 111-2; Doc. 112; Doc. 113).  GCIA is the official agency for seed certification in Georgia.

Ga. Code. Ann. § 2-11-52.  Crops are entered into the seed certification program solely for the purpose of propagating seed.  (Doc. 111-1 at 35-38; Doc. 111-2; Doc. 112 at 1-2).  Prior to harvest, GCIA inspected each Seed Growers' Florida-07 peanut acreage and approved all of the crops for registered class seed, with the exception of 1.4 acres:

| Seed Grower | Foundation seed purchased | Acres for seed certification | Acres approved for seed certification |
|---|---|---|---|
| Clenny Family Farms | 862 bags = 43,100 pounds | 291 | 290.6 |
| Summerlin Farms | 360 bags = 18,000 pounds | 149.7 | 149.7 |
| Pope Land Company | 66 bags = 3,300 pounds | 19 | 18 |
| Merle Smith | 212 bags = 10,600 pounds | 63 | 63 |
| Totals | 1,500 bags = 75,000 pounds | 522.7 | 521.3 |

(Doc. 111-1 at 36-38; 83-88; Doc. 111-2; Doc. 112; Doc. 113).  The Seed Growers harvested their Florida-07 seed crops in the fall of 2009 and delivered them to GFS, producing a yield of approximately 2,442,480 pounds of in-shell peanuts  (Doc. 114; Doc. 116)  A portion of the Seed Growers' Florida-07 seed crops - Merle Smith and Pope Land Company – were deposited directly into GFS's commercial peanut warehouse (warehouses 001-1 and 001-02) as soon as GFS received it.  (Doc. 111-1 at 47-48).  GFS directed the rest of the Florida-07 seed crops into warehouses designated for seed (warehouses 8-1 and 11-1):

| Seed Grower | Gross in-shell yield | Seed warehouses 8-1 and 11-1 | Comm. warehouses 001-1 and 001-02 |
|---|---|---|---|
| Clenny Family Farms | 1,610,960 | 1,610,960 | 0 |
| Summerlin Farms | 499,480 | 499,480 | 0 |
| Pope Land Company | 85,460 | 41,260 | 44,200 |
| Merle Smith | 246,580 | 0 | 246,580 |
| Totals | 2,442,480 pounds | 2,151,700 pounds | 290,780 pounds |

(*Id.*; Doc. 114; Doc. 114-2 at 4-8; Doc. 116 at 2-5).   The Florida-07 peanuts deposited into GFS's commercial warehouse were sold by GFS into commercial peanut markets.   (Doc. 111-1 at 48-49; Doc. 114-2 at 5-7).   In the spring of 2010, GFS sold the remaining in-shell Florida-07 seed crop to GSP.   (Doc. 115-2 at 5-8, 31-32).   GSP has never been authorized by FFSP to propagate, condition, sell, offer to sell, or otherwise use the Florida-07 variety for any purpose. (Doc. 115-2 at 99-105; Doc. 116-1 at 1; Doc. 116-2 at 10).   GSP has never held a seed dealers license from the Georgia Department of Agriculture under Ga. Code Ann. § 2-11-26.   (Doc. 116-2 at 19-20).

GSP conditioned (i.e., shelled and separated the "sound mature kernels" from the hulls and oil stock kernels) the Florida-07 seed crop it received from GFS, yielding 476,700 pounds of Florida-07 seed that GSP sold for seed, and 558,076 pounds of Florida-07 seed that GSP sold for non-seed purposes.   (Doc. 111-1 at 23-28; Doc. 114-2 at 7-11).   After conditioning, GSP stocked the Florida-07 peanut seed for sale to farmers, as demonstrated by the seed price list that listed all of the peanut seed varieties that it stocked for sale in the 2010 growing season.   (Doc. 116-1 at 1-2; Doc. 111-1 at 21-23).

The first four lots of Florida-07 peanut seed sold by GSP in 2010, while eligible for certification and considered registered Florida-07 seed, were not certified by GCIA.   (Doc. 111-1 at 52-55; Doc. 115 at 154-64).   On April 17, 2010, GSP sold and shipped these lots without official certification tags to growers Gene Roney and Stuart McClesky, totaling 90,000 pounds of seed.   (*Id.*)   GSP did not obtain authorization from FFSP to ship these lots of seed without official certification tags.   (Doc. 111-1 at 55-57).

From April 2010 through May 2010, GSP made approximately 50 individual seed sales of Florida-07 to growers, totaling 476,700 pounds.   (Doc. 111-1 at 61-62; Doc. 114-2 at 9-11;

Doc. 115 at 14-52).  None of the invoices used by GSP for these individual sales included any notice of the '069 Certificate or U.S. Patent Nos. 6,063,984, 6,121,984, and 5,922,390 covering the Florida-07 variety.  (Doc. 115 at 14-52).

GSP sold and transferred the remaining 558,076 pounds of Florida-07 seed for non-seed purposes in various commercial sales.  (Doc. 115-2 at 32-89).  GSP never sought, nor did it receive, authorization from FFSP to use Florida-07 seed for non-seed purposes.  (Doc. 111-1 at 49-51; Doc. 115-2 at 4-6; 99-104).

Upon learning of the sale of the four uncertified lots, FFSP terminated GFS' Seed Agreement on May 12, 2010.  (Doc. 111-1 at 57-61; Doc. 115 at 12-14).  Subsequent to the termination of GFS' Seed Agreement, both GFS and GSP began propagating a new Florida-07 seed crop. In June 2010, GFS and GSP entered the Florida-07 peanut crops of three farmers into the Georgia seed certification program: Baker Farms, O'Hearn Farms, and Jim Usry.  (Doc. 115-1 at 1-3).  These crops were planted with registered class Florida-07 seed purchased from GSP:

| Seed Grower | Bags = Pounds of registered seed | Acres for seed certification | Acres approved for seed certification |
|-------------|-----------------------------------|------------------------------|----------------------------------------|
| Baker Farms | 315 bags = 15,750 pounds | 112 | 0 |
| O'Hearn Farms | 900 bags = 45,000 pounds | 335 | 335 |
| Jim Usry | 344 bags = 17,200 pounds | 180 | 180 |
| Merle Smith | 212 bags = 10,600 pounds | 63 | 63 |
| Totals | 1,559 bags = 77,950 pounds | 627 | 515 |

(Doc. 115 at 16-19;  Doc. 115-1; Doc. 116-1).  Upon the harvest of this seed crop, these growers delivered at least 474.29 tons (948,580 pounds) to GFS and GSP.  (Doc. 111-1 at 66-72).

GFS is not a farmer, GSP is not a farmer, and William Douglas Wingate is not a farmer. (Doc. 111-1 at 20-21, 72-75; Doc. 115-2 at 9-12).   The University of Florida Research Foundation, Inc. ("UFRF") is a non-profit corporation organized under the laws of the State of Florida with its principal place of business at 223 Grinter Hall, Gainesville, FL 32611.  UFRF is the assignee of U.S. Patents 6,063,984, 6,121,984, and 5,922,390 covering inventions in high oleic peanuts and peanut products ("High Oleic patents").  (Doc. 116-2 at 9-23).  In February 2007, Wingate executed the separate license issued by UFRF for the High Oleic patents on behalf of GFS.  (Doc. 115-2 at 10-30).

## DISCUSSION

**I.**    **Standard of Review**

    **a.  Summary Judgment Standard and Procedure**

Pursuant to Federal Rules of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  An issue is "genuine" if the quantum and quality of proof necessary to support liability under the claim is raised.  Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997).  A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); *see also* Allen, 121 F.3d at 646.  A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the court on an essential element of the claim.  *See* Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Celetox, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact.  *See* Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See id.* at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party must therefore do more than summarily deny the allegations or "show that there is some metaphysical doubt as to the material facts."  Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must provide "enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 251 (1986)).

On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict.  *See* Celotex, 477 U.S. at 322-23; Allen, 121 F.3d at 646.  However, the court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).

**II.    Analysis**

   **a.  Plaintiff's PVPA Claim (Count I)**

Both Plaintiff and Defendants move for summary judgment on Count I of Plaintiff's Amended Complaint.  Plaintiff alleges the following violations of 7 U.S.C. § 2541 by the various defendants:  (1) GFS's sale and offer for sale of uncertified Florida-07 seed to GSP; (2) GSP's

sale and offer for sale of uncertified Florida-07 seed through sale of 4 lots of uncertified seed; (3) GSP's act of conditioning and stocking Florida-07 seed for the purpose of propagation; (4) Wingate's active inducement or instigation of unauthorized use and sale of Florida-07 seed by GFS and GSP; and (5) Defendants' continued use, sale, offer to sell, or transfer Florida-07 seed without authorization, both for propagation and through sale of Florida-7 seed for non-seed purposes.   Plaintiff asserts that failure to properly label the four lots sold with certification tags renders the seed uncertified, as the lots did not complete the certification process.  Plaintiff also contends that Defendants' arguments that all of their actions were licensed rely on the fiction that all the Defendants are a single unit and the acts of one may be attributed to the others.  Plaintiff argues that each Defendant is a distinct entity that cannot simply adopt the rights granted to another entity under the license agreement to avoid infringement.

Defendants argue that the shipment of the four lots does not constitute infringement because GFS and Plaintiff were parties to a valid license agreement that allowed GFS to propagate, market, and sell Florida-07 peanut seed.   Defendants also contend that the conditioning by GSP does not constitute infringement because GSP purchased the seed from GFS, which had a license to condition and sell Florida-07 seed.  Finally, Defendants assert that despite the absence of certification tags from the four lots of seed, the seeds were "registered" seed as they met the requirements of 7 U.S.C. § 1562, did not need a certification tag, and still qualified as a class of certified seed, thus precluding infringement.  Defendants also argue that the delivery tickets and Certified Germination Reports contained all the information required under O.C.G.A. § 2-11-22, the statute that sets forth Georgia's labeling requirements, or under 7 C.F.R. 201.74(b), the regulation governing bulk sales labels.

**1.      GFS's Sale and Offering for Sale of Florida-07 Seed to GSP:**

11

Plaintiff alleges that GFS violated Plaintiff's rights under 7 U.S.C. 2541(a)(1) when GFS sold Florida-07 seed to GSP in the Spring of 2010.  Plaintiff argues that the Seed Agreement limited the use of the Florida-07 variety to the propagation, marketing, and sale of the Florida-07 seed, and specifically prohibits assignment of plant material.  (Doc. 117 at 8).  When GFS sold the seed crop to GSP, Plaintiff argues that GFS was assigning or transferring the seed crop to GSP by possession, in violation of 7 U.S.C. 2541(a)(1)'s prohibition on non-authorized assignments or transfers of seed crop.

Defendants first argue that Plaintiff's failure to allege violation of the PVPA through "assigning Plant Material" in its Amended Complaint should lead the Court to dismiss this Claim.  Defendants then argue that even if the Court does consider the claim, Plaintiff's interpretation of the Seed Agreement is wrong.  Defendants assert that the Seed Agreement's definition of "Plant Material" as "the entire plant" only prevents sales, assignments, and transfers of the entire plant itself, rather than component parts of the plant.  As the transfer between GFS and GSP only included peanut seed, it did not violate the prohibition on sales, assignments, and transfers of the "plant material."  Moreover, Defendants contend that the Seed Agreement expressly allows GFS to execute the action of selling Florida-07 seed regardless of the purpose for which the seed is used.

The Court first addresses Defendants' argument that Plaintiff has abandoned this Claim. In Plaintiff's First Amended Complaint, Plaintiff states that "GFS delivered, shipped, consigned, or otherwise transferred these Florida-07 peanuts to Great Southern Peanut for conditioning and processing as peanut seed." (Doc. 37 ¶ 17).  Plaintiff continues on to state that "PVPA rights are also infringed when a protected variety is delivered, consigned, transferred, conditioned for propagation, or stocked for infringing purposes without the authority of the owner…As set forth

above, GFS, or Great Southern, or both of them, offered for sale, and sold, uncertified Flordia-07 peanut seed without authorization in violation of 7 U.S.C. § 2541." (*Id.* ¶¶ 23, 25). In light of the allegations found in the Amended Complaint, the Court finds that Plaintiff provided notice of its claims of unauthorized assignment/transfer of seed crop through GFS's sale of seed to GSP and the factual grounds upon which the claims rest. Accordingly, the Court finds that Plaintiff did not abandon the claims related to GSF's sale and transfer of seed to GSP. The Court now addresses the infringement claim.

The PVPA only considers an act to be infringing when it is undertaken without authority. 7 U.S.C. § 2541(a). Accordingly, to determine the scope of prohibited acts and whether GFS's sale of seed to GSP violated the PVPA, the Court must look to the language of the Seed Agreement, which sets forth the authorized actions of the licensee, GFS.

Under Florida law[2], contract interpretation is "for the court as a matter of law, rather than the trier of fact, only when the agreement is totally ambiguous, or when any ambiguity may be resolved by applying the rules of construction." Land O'Sun Realty Ltd. v. REWJB Gas Inv., 685 So. 2d 870, 872 n.3 (Fla. Dist. Ct. Appl. 1996). When a contract term is clear and unambiguous, the best evidence of this intent is the term itself, and a court may not give such term meaning beyond that clearly expressed in the four corners of the document. Fecteau v. Southeast Bank, N.A., 585 So. 2d 1005, 1007 (Fla. Dist. Ct. App. 1991).

"Plant Material" is defined in Section 1(b) of the Seed Agreement, which states that "'[p]lant material' shall mean the entire plant including all seed, cell matter and genetic material transferred or inherited." (Doc. 124 at 1). Section 2(e) states that "[t]he Plant Material supplied, or propagated….are not assignable to…another individual, partner, group, affiliate or company

---

[2] The Seed Agreement contains Florida choice of law provisions. Thus, Florida law governs the interpretation of the Seed Agreement and Plaintiff's contract claims.

through contract, lease, or merger.  LICENSEE shall not make, use, have made, offer for sale, sell, export, or import Plant Material except as permitted under this Agreement." (*Id.*)  The uses permitted by the Seed Agreement are listed under Section 2(a), which states "FFSP hereby grants to Licensee…a…license…to propagate, market, and sell seed of the Licensed Plant Material…No Plant Material supplied, or originating from the Plant Material produced under this Agreement will be used for any purpose other than that stated in this Agreement without the express written permission of FFSP." (*Id.*)

   Defendants argue that "plant material" exclusively means an entire plant, rendering any transfer, sale, or assignment of a portion of a plant less than an entire plant, for example, a seed, a valid act within bounds of the Seed Agreement.  The rule of construction relating to contractual terms requires "courts to read provisions of a contract harmoniously in order to give effect to all portions thereof."  <u>City of Homestead v. Johnson</u>, 760 So.2d 80, 84 (Fla.2000); <u>Davis v. Ivey</u>, 984 So.2d 571, 573 (Fla. 5th DCA 2008).  An interpretation giving a reasonable meaning to all provisions of a contract is preferred to one that renders part of the contract meaningless. <u>Premier Ins. Co. v. Adams</u>, 632 So.2d 1054, 1057 (Fla. 5th DCA 1994).

   Defendants' interpretation of "Plant Material" creates a contradiction in the contract that ignores other contractual language.  Specifically, Section 2(a) specifically state that "no plant material supplied or propagated…will be used for any purpose other than that stated in this Agreement." (Doc. 124 at 1).  Section 2(e) also states that "[t]he plant material supplied, or propagated…are not assignable to…another individual, partner, group, affiliate or company through contract, lease or merger." (*Id.*)  Finally, the Seed Agreement makes clear in Section 2(d) that "LICENSEE agrees to…[m]ake an annual written request to FFSP…for Foundation seed stock to be purchased and for Licensee's use…[o]btain Foundation seed only from FFSP."

(*Id.*)  Sections 2(a) and (e) prevent the Licensee from distributing the "plant material" supplied by Plaintiff.  However, the only material supplied by Plaintiff is seed, as stated in Section 2(d).  Were Defendants' interpretation of "plant material" controlling, the restrictions placed on the seed supplied by Plaintiff would be nullified.  A reasonable construction of the sections of the Seed Agreement yield the interpretation that "plant materials" consists of any portion of the plant, including all seed, cell matter, and genetic matter transferred or inherited.  The Court finds unpersuasive Defendants' argument that an "only" should be read into the definition of "plant material," such that "plant material" means "only the entire plant."  Such an interpretation imports an exclusive element into the definition of plant material that does not exist in light of the language of the contract as a whole.

The Court now addresses whether GFS's seed transfer to GSP violated the PVPA.  The PVPA provides a 20-year period of patent protection to breeders of certain plant varieties, who may acquire "the right . . . to exclude others from selling the variety, or offering it for sale, or reproducing it, or importing it, or exporting it, or using it in producing . . . a hybrid or different variety therefrom."  Syngenta Seeds, Inc. v. Delta Cotton Co-Operative, Inc., 457 F.3d 1269, (Fed. Cir. 2006) (quoting 7 U.S.C. § 2483(a)(1)).  Courts have interpreted the broad language of section 2541(a) as intending to confer upon "the holder of a PVP Certificate rather broad exclusive rights."  Delta & Pine Land Co. v. Sinkers Corp., 177 F.3d 1343, 1347 (Fed. Cir. 1999).  In 7 U.S.C. § 2541(a), the PVPA provides enumerates ten categories of activities that constitute infringement.  Section 2541(a)(1) states that:

> (a)     Except as otherwise provided in this subchapter, it shall be an infringement of the rights of the owner of a protected variety to perform without authority, any of the following acts . . . prior to expiration of the right to plant variety protection but after either the issue of the certificate or the distribution of a protected plant variety with the notice under section 2567 of this title:

(1)     sell or market the protected variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it.

7 U.S.C. § 2541(a)(1).  Plaintiff argues that GFS's Spring 2010 sale of Florida-07 seed crop to GSP acted as an assignment or transfer of possession of the seed crop, thereby breaching the Seed Agreement and violating § 2541(a)(1).  (Doc. 117 at 8-9).  Defendants argue that the sale could not constitute infringement under the PVPA because the only transfer was of seeds handled by GFS pursuant to its license with Plaintiff.

Defendants' arguments are unpersuasive.  The terms of the Seed Agreement govern the infringement analysis, as the Agreement defines the acts allowed by the rights holder under the PVPA.  The Seed Agreement states that the "Plant Material supplied, or propagated…are not assignable to…another individual, partner, group, affiliate or company…"  (Doc. 124 at 1). Defendants essentially argue that GFS had the right to sublicense certain actions to third-parties, in this instance, GSP.  However, the Seed Agreement clearly states that "Licensee shall not have the right to grant sublicenses or cross-license."  (*Id.*)

Section 2541(a)(1) of the PVPA states that "it shall be an infringement of the rights of the owner of a protected variety to…without authority...sell or market the protected variety…or [commit] any other transfer of title or possession of it."  There is no dispute that the Florida-07 variety is a protected variety, and that Plaintiff is the owner of the Florida-07 variety.  Moreover, the record demonstrates that the Seed Growers harvested the Florida-07 seed crop and delivered it to GFS.  (Docs. 114, 116).  The record also reflects that in the Spring of 2010, GFS sold a portion of the seed to GSP and transferred possession of the seed to GSP, without prior authorization from Plaintiff.  (Doc. 115-2 at 5-7).  Accordingly, the Court finds that no genuine issue of material fact remains as to whether GFS's transfer of seed from GFS to GSP violated 7

U.S.C. § 2541(a)(1) and infringed Plaintiff's right as the owner of a protected variety, the Florida-07. Plaintiff's Motion for Partial Summary Judgment (Doc. 111) for infringement under 7 U.S.C. § 2541(a)(1) as to GFS's transfer of seed from GFS to GSP is **GRANTED.**

### 2.     GSP's Acts of Conditioning and Stocking Florida-07 Seed for the Purpose of Propagation:

Plaintiff alleges that GSP violated Plaintiff's rights under 7 U.S.C. §§ 2541(a)(7) and (8) when, starting in April 2010, GSP conditioned and stocked the Florida-07 seed crop it acquired from GFS. (Doc. 117 at 9). Plaintiff argues that GSP's complete lack of authorization to perform any action related to the Florida-07 variety renders its actions in conditioning and stocking Florida-07 seed as infringement under the PVPA. Plaintiff also asserts that the three leading cases used to construe the PVPA do not create a safe harbor for unauthorized conditioning, as all three cases involve farmer to farmer sales of saved seed relying on a pre-1994 version of the PVPA and are thus both factually and legally distinguishable.

Defendants argue that conditioning authentic peanut seed for an authorized licensee does not constitute a violation of the PVPA because the conditioning is performed with the authority of the PVPA certificate owner and is necessary to allow the seed to be sold. To support this argument, Defendants cite to Delta and Pine Land Co. v Sinkers Corp., 177 F.3d 1343 (Fed. Cir. 1999), arguing that the Federal Circuit held that infringement by a seed conditioner does not occur when the seed is the subject of a permissible sale under the PVPA. Defendants also argue that both the GCIA and the University of Florida were informed of GSP's relationship with GFS in March 2009, thus preventing infringement.

Under 7 U.S.C. § 2541(a)(7), conditioning a protected variety for the purpose of propagation, except to the extent that the conditioning is related to the activities permitted under section 2543, is considered infringement. Section 2543 states the following:

> Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541(1) of this title, it shall not infringe any right hereunder for a person to save seed produced by the person from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on the farm of the person, or for sale as provided in this section. A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. A purchaser who diverts seed from such channels to seeding purposes shall be deemed to have notice under section 2567 of this title that the actions of the purchaser constitute an infringement.

Section 2543 creates a limited exception for conditioning farmer saved seed. However, it does not apply in the instant situation, as the parties agree that no entity is acting as a farmer for the purpose of Section 2543. Moreover, the Court finds that the Sinkers case in inapposite in the instant situation. In Sinkers, the Federal Circuit's analysis also occurred in the context of the pre-1994 version of Section 2543 of the PVPA, which created a saved seed exemption for farmer to farmer sales. This exemption was eliminated in a 1994 amendment to the PVPA, which made the Act "consistent with the International Convention for the Protection of New Varieties of Plants of March 19, 1991[the UPOV Convention], to which the United States is a signatory." H.R. REP. NO. 103–699, at 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2423, 2423.

Moreover, following the amendment of the PVPA in 1994, unauthorized seed conditioning became a ground for infringement. In light of the changes to the PVPA and the inapplicability of the case law offered by Defendants, the Court is not persuaded by Defendants' argument that infringement by a seed conditioner is sanctioned when the seed is the subject of a permissible sale.

Nor is the Court convinced the alleged notice provided to GCIA and the University of Florida authorizes the sale. The Seed Agreement states in Section 2(a) that "[n]o Plant Material

supplied or originating from the Plant Material produced under this Agreement will be used for any purpose other than that stated in this Agreement without the express written permission of FFSP." Defendants offer no authority that states that the provisions of a licensing agreement between a licensee and a licensor that has been assigned all rights under a plant variety certificate should be discarded when the licensee bypasses the licensor and notifies the original bearer of the certificate of a change in corporate structure. It is undisputed that Plaintiff did not provide written permission to authorize GFS to sublicense conditioning and stocking to GSP.

Under 7 U.S.C. § 2541(a)(7), conditioning a protected variety for the purpose of propagation without authority is considered infringement. Moreover, under § 2541(a)(8), stocking the variety for conditioning for the purpose of propagation without authority is considered infringement. The record reflects that GSP did not have a license or any authority from Plaintiff to condition, stock, or take any action with regard to the Florida-07 variety. The record also demonstrates that GSP conditioned and stocked, for the purpose of propagation, the Florida-07 seed crop it received from GFS, yielding 476,000 pounds of Florida-07 seed that GSP sold for seed. (Doc. 111-1 at 23-26; Doc. 114-2 at 7-10). Accordingly, the Court finds that no genuine issue of material fact remains as to whether GSP's conditioning and stocking of Florida-07 seed violated 7 U.S.C. §§ 2541(a)(7) and (8) and infringed Plaintiff's right as the owner of a protected variety, the Florida-07. Plaintiff's Motion for Partial Summary Judgment (Doc. 111) for infringement under 7 U.S.C. §§ 2541(a)(7) and (8) as to GSP's conditioning and stocking of Florida-07 seed is **GRANTED.**

### 3. GSP's Alleged Act of Sale and Offering for Sale Florida-07 Seed:

Plaintiff states two distinct grounds for GSP's alleged violation of 7 U.S.C. § 2541(a)(1). First, Plaintiff argues that GSP's sale of four lots of uncertified seed to Gene Roney and Stuart

McClesky on April 17, 2010, constitutes infringement, as GSP was not a licensed seller of Florida-07 seed. (Doc. 117 at 9). Plaintiff also contends that even if GSP was a licensed seller, which it is not, the sale of uncertified seed would still be a violation of the Seed Agreement and of the PVPA. Plaintiff then argues that GSP's sale of uncertified seed into various non-seed channels also constituted infringement, as GSP had no authority to sell a protected variety.

Defendants argue that the sale of the four lots of seed was not infringement. Defendants assert that the sale occurred on April 17, 2010, while GFS and Plaintiff were still party to a valid license agreement that allowed GFS to sell Florida-07 seed. Accordingly, Defendants assert that the sale was made with the authority of Plaintiff, and cannot violate the PVPA. Moreover, Defendants argue that the absence of certification tags does not make the seed uncertified. Defendants argue that the seed was indisputably eligible for certification and was considered "registered seed," a class of certified seed. The absence of the certification tags does not change the inherent nature of the seeds themselves.

With respect to the sale of seed into non-seed channels, Defendants first argue that such a claim is outside of the scope of Plaintiff's Complaint and Amended Complaint, and as such, is deemed abandoned. Defendants then cite to the Supreme Court's decision in Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 181 (1995) to support their argument that a sale of seed for consumption does not violate the PVPA.

### i.  GSP's sale of four lots of uncertified seed to Gene Roney and Stuart McClesky on April 17, 2010

Defendants argue that the sale of the four lots by GSP does not infringe Plaintiff's rights under the PVPA because  Plaintiff authorized GFS to sell Florida-07 seed. However, the record reflects that it was not GFS that sold the seed to Gene Roney and Stuart McClesky; on the

contrary, the entity that sold the four lots was GSP.  (Doc. 111-1 at 52-54; Doc. 115 at 2-9).  The record also reflects that GSP has never been authorized by Plaintiff to propagate, condition, sell, offer to sell, or otherwise use the Florida-07 variety for any purpose.  (Doc. 116-1 at 1-3; Doc. 115-2 at 99-104).  Accordingly, Defendants' theory only holds merit if they can argue that GSP's actions were covered by the license issued to GFS by Plaintiff.  Defendants do not make this contention.  Nor would the Court give credence to such an argument, as the terms of the Seed Agreement specifically prohibit the Licensee from granting sublicenses and cross-licenses. (Doc. 124 at 1).  Section 2541(a)(1) of the PVPA states that "it shall be an infringement of the rights of the owner of a protected variety to…without authority...sell or market the protected variety."  There is no dispute that the Florida-07 variety is a protected variety, and that Plaintiff is the owner of the Florida-07 variety.  Moreover, as stated above, the record demonstrates that GSP has never been authorized by Plaintiff to propagate, condition, sell, offer to sell, or otherwise use the Florida-07 variety for any purpose.  (Doc. 116-1 at 1-3; Doc. 115-2 at 99-104). The record also shows that on April 17, 2010, GSP sold four lots of seed to Gene Roney and Stuart McClesky.  (Doc. 111-1 at 52-54; Doc. 115 at 2-9).  Accordingly, the Court finds that no genuine issue of material fact remains as to whether GSP's sale of four lots of seed to Gene Roney and Stuart McClesky on April 17, 2010 violated 7 U.S.C. § 2541(a)(1) and infringed Plaintiff's right as the owner of a protected variety, the Florida-07.  Plaintiff's Motion for Partial Summary Judgment (Doc. 111) for infringement under 7 U.S.C. § 2541(a)(1) as to GSP's sale of four lots of seed to Gene Roney and Stuart McClesky on April 17, 2010 is **GRANTED.**

### ii.    GSP's sale of seed into non-seed or commercial channels

The Court must first address Defendants' argument that Plaintiff's claim of infringement based on GFS's sale of seeds into non-seed or commercial channels is outside the scope of the

Complaint and Amended Complaint.   The Amended Complaint sets forth the following allegations:

> 18.  On information and belief, Great Southern conditioned Florida-07 peanuts for the purpose of propagation, and stocked Florida-07 peanuts in order to sell, offer to sell, deliver, ship, or otherwise transfer those peanuts for further propagation and planting.
> 19.   In the spring of 2010, just prior to peanut planting season, either GFS or Great Southern or both offered to sell and sold four lots of uncertified Florida-07 peanut seed to peanut growers for planting.
> 20.  On information and belief, GFS or Great Southern or both of them still has at least ten lots of uncertified Florida-07 seed in its inventory.
> 21.   Defendant Great Southern has never obtained a license from FFSP to use, sell, market, condition, stock, or otherwise handle Florida-07 peanut seed.

(Doc. 37 at 4-8).  The Amended Complaint also includes the following statements under Count I, Infringement of Plant Variety Protection Certificate:

> 25.  As set forth above, GFS, or Great Southern, or both of them, offered for sale and sold uncertified Florida-07 peanut seed without authorization in violation of 7 U.S.C. § 2541.
> 28.  On information and belief, the Defendants have been, and may be continuing to, infringe by using, offering to sell, selling, or otherwise transferring Florida-07 peanut seed without authorization.

Federal Rule of Civil Procedure 8(a) requires a pleading contain a short and plain statement showing that the pleader is entitled to relief and a demand for judgment for the relief sought.  A complaint must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  This plausibility standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Twombly, 550 U.S. at 556, 127 S.Ct. 1955).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam).

While Defendants argue that both the Complaint and Amended Complaint are devoid of the specific allegation that the sale of peanuts to the edible market violated the PVPA, they do not deny that Plaintiff did allege that the sale of peanuts by GSP violated the PVPA.  Nor are the cases cited by Defendants relevant to the instant situation, as they address claims never raised in any form in a complaint.   A heightened pleading standard is not required in patent infringement cases, and the Court finds no authority requiring a heightened pleading standard in a PVPA case. *See* Ware v. Circuit City Stores, Inc., 2010 WL 767094, at *2 (N.D. Ga. Jan. 25, 2010).

From the filing of the Amended Complaint, GSP has been on notice of the infringement claims against it have been based on the sale of peanuts.  In fact, Plaintiff amended its original Complaint to add GSP as a Defendant as it discovered the extent of GSP's activities, and Count I specifically alleges infringement through sale of Florida-07 seed by GSP.  Moreover, the record is replete with correspondence and discussion of all of GSP's actions in relation to the Florida-07 seed, not just the seed that was sold on April 17, 2010.  Accordingly, the Court finds that Plaintiff adequately raised a claim for infringement through sale of Florida-07 seed against GSP in its Amended Complaint.

The Court now turns to the actual claim of infringement itself.  Plaintiff alleges that GFS's sale of seed for non-seed purposes such as the edible market violated the PVPA. Defendants argue that under the PVPA, only sales of seed for propagation purposes infringe the certificate holder's rights.   As the relevant sale of seed was for consumption rather than propagation, Defendants assert that no violation of the PVPA occurred.

The foundation of Defendants' argument derives from the Supreme Court's 1995 decision in Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 181 (1995), in which the Court stated, "the PVPA "protects owners of novel seed varieties against unauthorized sales of their seed for

replanting purposes." However, Defendants' reading of <u>Asgrow</u> fails to account for the context of the case – the Court was re-examining the then-available saved-seed exemption for farmers. The Court determined that the saved seed exemption meant "seed saved for replanting…not merely crop that is stored for later market sale or use as fodder." <u>Asgrow</u>, 513 U.S. at 188-89. However, in the same opinion, the Court also observed that Section 2541(a)(1) of the PVPA "prohibits all unauthorized transfer of title to, or possession of, the protected variety." *Id.* at 191. Thus, as our sister district court found, "the most logical reading of the Supreme Court's use of "for replanting purposes" at the beginning of its opinion is not as a broad limitation on the protection the PVPA affords, but as the Court setting the stage for its later discussion of the then-applicable "saved seed exemption." <u>AGSouth Genetics, LLC v. Cunningham</u>, 2011 WL 1833016, at *5 (S.D. Ala. May 13, 2011).

Moreover, the language of the statute itself does not support Defendants' interpretation of <u>Asgrow</u>, as the infringement provision of the PVPA fails to mention "replanting" as a prerequisite to infringement. As the court found in <u>AGSouth Genetics</u>, the legislative history of the PVPA after the 1994 Amendment provides no indication that an intent to "replant" was ever considered to be a prerequisite to infringement. *Id.* at *6. In light of this context, the Court does not interpret <u>Asgrow</u> to provide an exemption from infringement when the sale of seed is for "other than reproductive purposes." Rather, under 7 U.S.C. § 2541, any sale occurring outside of the authority of the certificate holder is considered an infringing act.

Section 2541(a)(1) of the PVPA states that "it shall be an infringement of the rights of the owner of a protected variety to…without authority...sell or market the protected variety." There is no dispute that the Florida-07 variety is a protected variety, and that Plaintiff is the owner of the Florida-07 variety. Moreover, as stated above, the record demonstrates that GSP has never

24

been authorized by Plaintiff to propagate, condition, sell, offer to sell, or otherwise use the Florida-07 variety for any purpose. (Doc. 116-1 at 1-3; Doc. 115-2 at 99-104). The record also shows that GSP sold 558,076 pounds of Florida-07 seed for non-seed purposes in various commercial sales. (Doc. 115-2 at 32-87). Accordingly, the Court finds that no genuine issue of material fact remains as to whether GSP's sale of 558,076 pounds of Florida-07 seed for non-seed purposes in various commercial channels violated 7 U.S.C. § 2541(a)(1) and infringed Plaintiff's right as the owner of a protected variety, the Florida-07. Plaintiff's Motion for Partial Summary Judgment (Doc. 111) as to infringement under 7 U.S.C. § 2541(a)(1) for GSP's sale of 558,076 pounds of Florida-07 seed for non-seed purposes in various commercial channels is **GRANTED.**

### 4.      Defendants' Alleged Continued Use, Sale, Offer to Sell, or Transfer of Florida-07 seed Without Authorization:

Plaintiff alleges that following the termination of GFS's Seed Agreement with Plaintiff, both GFS and GSP violated the PVPA. Specifically, Plaintiff alleges that GSP sold 1559 bags of seed crop propagated by GFS to three additional customers. (Doc. 117 at 11). Plaintiff alleges that the propagation to the three customers was for seed purposes. (*Id.*) Plaintiff also argues that the actions undertaken by Defendants constitute willful infringement of 7 U.S.C. § 2541(a)(3) and (5), as they were fully aware that they were acting without a license. (*Id.* at 12).

Defendants first argue that the allegations related to willful infringement are outside the scope of the Complaint and Amended Complaint. However, in Count 1 of the Amended Complaint, Plaintiff specifically alleges that "Defendants have been, and may be continuing to, infringe by using, offering to sell, selling, or otherwise transferring Florida-07 peanut seed without authorization." (Doc. 37 ¶ 28). Because Plaintiff has given Defendants fair notice of the claim (infringement) and the grounds upon which it rests (use, sale, or otherwise transfer Florida-

07 seed without authorization), the Court will consider Plaintiff's claim.   *See* Erickson v.

Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

Defendants then argue that the claim fails because the bags of seed sold were registered

Florida-07 seed bearing certification tags issued by GCIA.  (Doc. 144 at 10).  Defendants cite to

O.C.G.A. § 2-11-23(c)(7), which Defendants allege makes the sale of PVPA protected seed

unlawful only when the seed has not been certified by an official seed certifying agency.  (*Id.* at

11).   The Court was unable to locate the specific section cited as it, like the unicorn, did not

exist.  However, the Court discovered that a more corporeal section does exist and provides the

following language:

> (a) No person shall sell, offer for sale, expose for sale, or transport for sale any
> agricultural, vegetable, flower, tree, or shrub seed within this state: (7) Labeled
> with a variety name but not certified by an official seed certifying agency when it
> is a variety for which a United States certificate of plant variety protection under
> the Plant Variety Protection Act (7 U.S.C. § 2321, et seq.) specifies sale only as a
> class of certified seed, provided that seed from a certified seed lot may be labeled
> as to variety name when used in a mixture by, or with the approval of, the owner
> of the variety.

O.C.G.A. § 2-11-23(a)(7).  Assuming this is the section Defendants were referring to, the

Court is not persuaded by Defendants' argument.   O.C.G.A. § 2-11-23(a)(7) requires a

certification tag to be attached to sales of certified seeds, but it provides no ability to sidestep the

authority of a certificate holder and sell seed without a license, and Defendants provide no case

law supporting such a contention.

Finally, Defendants argue that because none of the seed that resulted from the sale of the

1559 bags was replanted for seed propagation purposes but instead sold on the edible market, no

infringement occurred.  (Doc. 144 at 11).  As the Court noted above, this argument fails; any

seed sold without authorization of the certificate holder under the relevant law constitutes

infringement.

Section 2541(a)(3) of the PVPA states that "it shall be an infringement of the rights of the owner of a protected variety to…without authority... sexually multiply, or propagate by a tuber or a part of a tuber, the variety as a step in marketing (for growing purposes) the variety." There is no dispute that the Florida-07 variety is a protected variety, and that Plaintiff is the owner of the Florida-07 variety. However, Plaintiffs offer no evidence demonstrating that Defendants propagated the seed through the use of tuber or portions of tuber as a step in marketing. Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 111) as to infringement under 7 U.S.C. § 2541(a)(3) is **DENIED**, and Defendants' Motion for Summary Judgment (Doc. 109) as to infringement under  7 U.S.C. § 2541(a)(3) is **GRANTED.**

Section 2541(a)(5) of the PVPA states "it shall be an infringement of the rights of the owner of a protected variety to…without authority... that use seed which had been marked "Unauthorized Propagation Prohibited" or "Unauthorized Seed Multiplication Prohibited" or progeny thereof to propagate the variety." There is no dispute that the Florida-07 variety is a protected variety marked with the appropriate labels described above, and that Plaintiff is the owner of the Florida-07 variety.  The record demonstrates that after Plaintiff had cancelled the Seed Agreement, GFS propagated a new Florida-07 seed crop, and that GFS transferred that crop of Florida-07 seed to GSP for conditioning.  (Doc. 115-1; Doc. 111 at 9).  The record also shows that GSP has never been authorized by Plaintiff to propagate, condition, sell, offer to sell, or otherwise use the Florida-07 variety for any purpose.  (Doc. 116-1 at 1-3; Doc. 115-2 at 99-104). Finally, the record shows that GSP sold 1559 bags of seed to three customers for the purpose of propagation after the cancellation of the Seed Agreement.  (Doc. 115 at 17-19, 44; Doc. 115-1 at 1-3, Doc. 114-2 at 9-11).  Accordingly, the Court finds that no genuine issue of material fact remains that: (1) GFS's propagation and sale of Florida-07 seed to GSP after the cancellation of

the Seed Agreement; and (2) GSP's sale of 1559 bags of seed to three customers for the purpose of propagation after the cancellation of the Seed Agreement violated 7 U.S.C. § 2541(a)(5) and infringed Plaintiff's right as the owner of a protected variety, the Florida-07.  Plaintiff's Motion for Partial Summary Judgment (Doc. 111) as to infringement under 7 U.S.C. § 2541(a)(5) is **GRANTED**, and Defendants' Motion for Summary Judgment (Doc. 109) as to infringement under 7 U.S.C. § 2541(a)(5) is **DENIED.**

a.      <u>Willful Infringement:</u>

To establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." <u>In re Seagate Tech., LLC</u>, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Stated another way, "proof of willfulness…requires at least a showing of objective recklessness." *Id.*  Once the "threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk…was either known or so obvious that it should have been known to the accused infringer." *Id.*

Following <u>Seagate</u>, the Federal Circuit established the rule that generally "the objective prong of <u>Seagate</u> tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." <u>Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.</u>, 620 F.3d 1305, 1319 (Fed. Cir. 2010). Thus, the question is whether a defense or non-infringement theory was "reasonable." *See, e.g.,* <u>Powell v. Home Depot U.S.A., Inc.</u>, 663 F.3d 1221, 1236 (Fed. Cir. 2011).

In the patent context, courts have found that legitimate defenses to infringement claims and credible invalidity arguments demonstrate a lack of an objectively high likelihood that a party took action constituting infringement of a valid patent. *See* <u>Black & Decker, Inc. v. Robert</u>

28

Bosch Tool Corp., 260 Fed. Appx. 284, 291 (Fed. Cir. 2008).  However, in the context of PVPA cases, the validity of the certificate is rarely in question.  Thus, the Court turns to the legitimacy of the infringement defenses offered by Defendants.  As neither defense is based on factual matters, the Court can properly determine whether reliance on these defenses by Defendants was reasonable.  *See* Powell, 663 F.3d at 1236.

Defendants first argue that O.C.G.A. § 2-11-23(a)(7) renders the sale of PVPA protected seed unlawful only when the seed has not been certified by an official seed certifying agency.  (Doc. 144 at 11-12).  As the Court stated above, this alleged defense to infringement is based on a misreading of the statute.  As such, it cannot offer a legitimate defense to infringement.  *See* Gustafson, Inc. v. Intersystems Indus. Prod., Inc., 897 F.2d 508, 511 (Fed. Cir. 1990) ("Presentation in bad faith of a totally unsupportable frivolous defense may…also constitute some evidence that continued infringement was willful."); *Cf.* Kaufman Co., Inc. v. Lantech, Inc., 897 F.2d 970, 979 (Fed. Cir. 1986) (Court upheld finding of willful infringement where Defendant had knowledge of patent, received notice of infringement, and Defendant's defense of non-infringement was found to be weak, except to the extent that its interpretation of the relevant statute had merit).  Defendants also argue that because the seeds were ultimately sold for non-seed purposes, no infringement occurs under the PVPA.  Again, this alleged defense to infringement is based on a misreading of case law and the PVPA.  The Court finds that neither defense against infringement offered by Defendants can be considered legitimate or reasonable.  Accordingly, the Court finds that Defendants' reliance on these unreasonable defenses was objectively reckless.   However, as shown below, this finding does not end the inquiry into or evaluation of Defendants' defenses.

The Court now turns to the subjective prong of the <u>Seagate</u> test.  Plaintiff cites to Wingate's deposition testimony to demonstrate that the risk of reliance on the unreasonable defenses was known or so obvious that it should have been known to Defendants.  However, the deposition testimony only illustrates that Wingate knew that GFS and GSP did not have a license for the Florida-07 variety at the time the infringing actions were undertaken.  (Doc. 117 at 11-12).  The testimony does not demonstrate that Wingate knew that the defenses offered were unreasonable or illegitimate, creating a genuine issue of material fact as to whether Wingate knew that the defenses offered were unreasonable or illegitimate.  Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 111) on the issue of willful infringement is **DENIED**.

### 5.    Wingate's Alleged Active Inducement or Instigation of Unauthorized Use and Sale of Florida-07 Seed by GFS and GSP:

Plaintiff argues that Wingate induced GFS and GSP, in violation of 7 U.S.C. § 2541(a)(10), to infringe on Plaintiff's rights under Sections 2541(a)(3) and (5).  Plaintiff asserts that Wingate's testimony, in which Wingate, the managing member of GFS and GSP, states that he knew the Seed Agreement was cancelled, demonstrates his active inducement.  (Doc. 117 at 12).  Defendants do not address this argument.

The Court will apply the theory of induced infringement as found in patent law.  "The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  <u>Manville Sales Corp. v. Paramount Sys., Inc.</u>, 917 F.2d 544, 553 (Fed. Cir. 1990), quoted in <u>DSU Med. Corp. v. JMS Co.</u>, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement - either a finding of specific instances of direct infringement or a finding that the accused products necessarily

infringe." Ricoh Co., Ltd. v. Quanta Computer, Inc., 550 F.3d 1325, 1341 (Fed. Cir. 2008). "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." DSU Med., 471 F.3d at 1306. A plaintiff may still prove the intent element through circumstantial evidence, just as with direct infringement, as discussed above.  *See id.; see also* Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").  Evidence of active steps taken to induce infringement, such as advertising an infringing use, can support a finding of an intention for the product to be used in an infringing manner.  DSU Med., 471 F.3d at 1305.

As the Court has found that Plaintiff cannot demonstrate Defendants violated 7 U.S.C. § 2541(a)(3), the Court's analysis is restricted to whether Wingate induced Defendants to violate 7 U.S.C. § 2541(a)(5).  Aside from Wingate's deposition testimony that he acted with full knowledge that GFS no longer had authority to propagate Florida-07 seed, Plaintiff offers no other evidence or argument supporting its inducement theory.

It is well settled that "corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement."  Power Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 481 (Fed. Cir. 1985).  To determine whether corporate officers are personally liable for infringement of the corporation under the PVPA requires invocation of the general principles relating to piercing of the veil.  Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1579 (Fed. Cir. 1986) (determining whether corporate officer can induce infringement under 35 U.S.C. § 271(b)).  Infringement is a tort, Carbice Corp. v. American

Patents Development Corp., 283 U.S. 27, 33 (1931), and officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious act. *See generally* 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1135 (rev. perm. ed. 1975). The cases are legion in which courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of infringement. *See, e.g.,* White v. Mar-Bel, Inc., 509 F.2d 287 (5th Cir. 1975).

Wingate is a founder and the managing member of both GFS and GSP, and executed the Seed Agreement between GFS and Plaintiff. (Doc. 111 at 4). The record firmly establishes that Wingate is the primary decision maker in GFS. (Doc. 159 at 8 ("I'm the manager of the company and any of the important decisions come by me"); Doc. 159 at 10 ("Most of them [final decision on any important decision] are [made by Wingate]")). Wingate also admits that there is no difference between GFS and GSP. (Doc. 159 at 228). However, Plaintiff has failed to provide evidence sufficient to demonstrate that Wingate encouraged GSP's and GFS's infringement. Instead, Plaintiff has only shown evidence demonstrating Wingate's knowledge of GFS's and GSP's infringement. Accordingly, the Court finds that a genuine issue of material facts remains as to whether Wingate encouraged GSP's and GFS's infringement. Plaintiff's Motion for Partial Summary Judgment (Doc. 111) on 7 U.S.C. § 2541(a)(10) is **DENIED**.

### b. Plaintiff's Breach of Contract Claim (Count II):

Both Plaintiff and Defendants move for summary judgment on Count II of Plaintiff's Amended Complaint. However, Plaintiff does not move for Summary Judgment on its breach of contract claim based on the grounds alleged in its Amended Complaint, but rather two new grounds.

### i.  Motion to Amend

In Plaintiff's Motion for Partial Summary Judgment, Plaintiff alleges that GFS violated the Seed Agreement when GFS (1) sold Florida-07 seed crop to GSP in the Spring of 2010 and (2) sold Florida-07 seed crop to the edible market.  Plaintiff asserts that the Seed Agreement limited the use of the Florida-07 variety to the propagation, marketing, and sale of the Florida-07 seed, and specifically prohibits assignment of plant material.  (Doc. 117 at 8).  Accordingly, Plaintiff contends that GFS's sale and transfer of Florida-07 seed crop to GSP constituted a violation of the Seed Agreement's prohibition on assignment of plant material, and GFS's sale of seed crop to the commercial market violated the Seed Agreement's prohibition on using the seed for any other purpose besides propagation, marketing, and sale of the seed for growing purposes.

Defendants first argue that Plaintiff's failure to allege breach of the Seed Agreement through "assigning Plant Material" and through sale of Florida-07 peanuts to the edible market in its Amended Complaint should lead the Court to dismiss these claims.  Defendants then argue that even if the Court does consider the claim, Plaintiff's interpretation of the Seed Agreement is wrong.  Defendants assert that the Seed Agreement's definition of "Plant Material" as "the entire plant" only prevents sales, assignments, and transfers of the entire plant itself, rather than component parts of the plant.  As the transfer between GFS and GSP only included peanut seed, it did not violate the prohibition in Seed Agreement on sales, assignments, and transfers of the "plant material."  Moreover, Defendants contend that the Seed Agreement expressly allows GFS to execute the action of selling Florida-07 seed regardless of the purpose for which the seed is used.

After a review of the Complaint and Amended Complaint, the Court finds that the claims Plaintiff asserts in its Motion for Partial Summary Judgment alleging breach of contract by GFS

are not found in either the Complaint or Amended Complaint.  The Amended Complaint sets forth two grounds for GFS's breach of contract: (1) that GFS sold uncertified Florida-07 seed to growers for planting without authorization, and (2) GFS failed to provide its purchasers of the Florida-07 seed actual notice of the intellectual property protections granted the Florida-07 variety.  (Doc. 37 at 7).  However, in its Motion for Partial Summary Judgment, Plaintiff sets forth two completely different and new grounds for breach of contract: (1) that GFS sold Florida-07 seed crop to GSP in the Spring of 2010 and (2) that GFS sold Florida-07 seed crop to the edible market.

Plaintiff, perhaps realizing that the claims alleged for the first time in its Motion vary greatly from those alleged in its Amended Complaint, moved for leave to amend its Amended Complaint in its Reply.  (Doc. 162 at 10).   Plaintiff argues that Fed. R. Civ. P. 15(a) should govern the analysis, and that amendment should be freely given when justice so requires.  (Doc. 162 at 10).  Inasmuch as Plaintiff failed to execute and file its Motion to Amend within 21 days of the filing of Defendants' Answer, its Motion to Amend cannot be granted under Rule 15(a)(1). Pursuant to Rule 15(a)(2),

> [i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

The decision whether to grant leave to amend a pleading is within the sound discretion of the district court but is not automatic.  Nat'l. Serv. Indus., Inc. v. Vafla Corp., 694 F.2d 246, 249 (11th Cir. 1982). "While motions to amend are committed to the sound discretion of the district court, this discretion is strictly circumscribed by the proviso that 'leave [should] be freely given when justice so requires.'" Gramegna v. Johnson, 846 F.2d 675, 678 (11th Cir. 1988). Accordingly, "a justifying reason must be apparent for denial of a motion to amend." Moore v.

34

Baker, 989 F.2d 1129, 1131 (11th Cir. 1993). The Court may consider "such factors as 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [and] futility of the amendment.'" Foman v. Davis, 371 U.S. 178, 182 (1962). "[U]nless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." Shipner v. Eastern Air Lines, Inc., 868 F.2d 401, 407 (11th Cir. 1989).

The Court questions whether the Motion to Amend is even properly before the Court. While Plaintiff asserts that ongoing discovery prevented it from filing an earlier Motion to Amend, the Court finds it troubling that Plaintiff did not file a separate and contemporaneous Motion to Amend with its Motion for Partial Summary Judgment. In filing the Motion to Amend as a Reply to its Motion for Partial Summary Judgment, Plaintiff does not provide Defendants an opportunity to present an opposition to the Motion to Amend and thus prejudices Defendants. Moreover, the timing of Plaintiff's Motion to Amend, more than two months after the deadline to file Motions for Summary Judgment, prevent Defendants from addressing the new claims Plaintiff wishes to add to its Complaint in Defendants' Motion for Summary Judgment, as they were not on fair notice of any need to defend against these claims or to address them in their motions for summary judgment. While Plaintiff states that discovery was ongoing to the end of the discovery period, Plaintiff fails to demonstrate why it could not have filed a motion to amend earlier or when the information supporting Plaintiff's motion was actually discovered.

The law of this Circuit forbids a plaintiff from amending its pleadings via arguments made in summary judgment briefs. *See* Hulbert v. St. Mary's Health Care System, Inc., 493 F.3d

1286, 1297 (11th Cir. 2006). The Court finds Plaintiff's Motion to Amend within its Reply for its Motion for Partial Summary Judgment nothing more than an attempt to amend its pleading via arguments. Accordingly, the Court finds that it is not in the interest of justice to grant Plaintiff's Motion to Amend, and so **DENIES** Plaintiff's Motion to Amend, and Plaintiff may not now raise a breach of contract claim on the grounds that (1) GFS sold Florida-07 seed crop to GSP in the Spring of 2010 and (2) GFS sold Florida-07 seed crop to the edible market. As Plaintiff moved for Summary Judgment on its breach of contract claims only on the newly alleged grounds, the Court also **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 111) on its newly alleged breach of contract claims.

### ii.    Defendants' Motion for Summary Judgment on Count II:

Defendants also moves for summary judgment on Plaintiff's breach of contract claims as identified in the Amended Complaint. (Doc. 109 at 7). The Amended Complaint sets forth two grounds for GFS's breach of contract: (1) that GFS sold uncertified Florida-07 seed to growers for planting without authorization, and (2) GFS failed to provide its purchasers of the Florida-07 seed actual notice of the intellectual property protections granted the Florida-07 variety. (Doc. 37 at 7). However, Defendants only move for summary judgment on Plaintiff's breach of contract claim with respect to the allegation that GFS sold uncertified Florida-07 seed to growers for planting without authorization. Defendants' Motion fails to address the second ground Plaintiff alleges for breach of contract, as such, this claim survives.

Defendant first asserts that no breach occurred because the four lots of seed sold to the two Dooly County farmers undoubtedly met the requirements for certification and the absence of the certification tags does not render the seeds uncertified. (Doc. 109 at 7). Defendants then assert that the absence of tags is due to Plaintiff's failure to assist GFS in obtaining tags, and

accordingly, the doctrine of unclean hands prevents Plaintiff from suing GFS for the absence of tags. (*Id.* at 8).  Finally, Defendants assert that because GFS has tendered the full amount of all royalties owed for the four lots, Plaintiff was not damaged, and no breach of contract occurred under Georgia law. (*Id.* at 8-9).

In Response, Plaintiff argues that the seed certification process involves a number of steps, each of which must be undertaken in order for a seed to be considered certified.  The steps include planting, growing, harvesting, drying, storage, conditioning, bagging, and labeling the seed.  Because the seeds were never labeled, Plaintiff asserts that the seed was uncertified, and the sale of uncertified seed breached the Seed Agreement.  Plaintiff also argues that the Seed Agreement chooses Florida law to govern its terms, and in Florida, substantial performance of a contract only occurs where the actual performance under a contract is nearly equivalent to what was bargained for.  Plaintiff asserts that Defendants barely arranged for propagation of the seed crop, and completely failed to market and sell certified classes of Florida-07 seed.  Accordingly, Plaintiff argues that Defendants did in fact breach the contract.  Finally, Plaintiff argues that the doctrine of unclean hands does not apply because Defendants broke the law of their own accord, without any trickery, fraud, or bad faith on the part of Plaintiff.

The parties' arguments regarding seed certification revolves around a single issue: whether a physical certification tag is necessary for seed to be considered certified.  O.C.G.A. § 2-11-23(a)(6) states that:

> No person shall sell, offer for sale, expose for sale, or transport for sale any agricultural, vegetable, flower, tree, or shrub seed within this state…[r]epresented to be "certified seed," "registered seed," or "foundation seed," unless it has been produced and labeled in accordance with the procedures and in compliance with rules and regulations of a legally authorized seed certification agency.

Based on the statutory language, the Court finds that "certified seed" is required to be labeled.  The Court now turns to the labeling requirements of the GCIA, the legally authorized seed certification agency for Georgia.  The GCIA describes its regulations for certification of seeds in its booklet called "General Seed Certification Standards," found at its website, certifiedseed.org.[3]  Section XVI of the Standards is "Tags, Labels, and Bags," and sets forth the regulations and procedures for selling certified seed.  Section XVI(A) states, "All seed stocks when sold as certified seed shall have an official tag or label properly affixed to each container."  Section XVI(B) states that the "certification tag, attached to the bag, serves as evidence of the varietal purity and identity of the seed contained therein."

Based on the regulations and standards set forth by the GCIA, the Court finds that "certified seed" must be physically tagged with certification tags issued by the GCIA to be considered certified.  Defendants' Motion for Summary Judgment is premised on alleging that "certified seed" does not require a certification tag from the GCIA.  Having found Defendants' premise to be contradicted by the directives of GCIA, the Court finds that a genuine issue of material fact remains.  Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 109) as to Plaintiff's breach of contract claim (Count II).

### c.      Plaintiff's Conversion Claim

Defendants argue, in a single paragraph without citation to supporting case law or evidentiary support, Plaintiff's conversion claim fails as a matter of law.  Defendants assert that Plaintiff's conversion claim is based on GFS's sale of the four lots of peanut seeds without certification tags.  (Doc. 109 at 9).  As GFS acted within the scope of the authority granted by its license with Plaintiff with respect to the sale of the four lots, Defendants argue that no

---

[3] As all parties have cited numerous times to this booklet, both in their respective briefs and in their Rule 56 Statements of Facts, the Court considers it as part of the Record.

conversion existed.  (*Id.*)  Defendants fail to address that the conversion claim is against all Defendants, not just GFS, and that the Amended Complaint does not limit the scope of the conversion claim to the single act identified by Defendants.  (Doc. 37 at 10).  Plaintiff asserts that Defendants' alleged sales into non-seed channels and continued propagation of seed crop in the 2010 growing season without a license falls within the definition of conversion.  (Doc. 139 at 9).  As Defendant has provided no evidence with respect to all Defendants and the full range of actions implicated by Plaintiff's conversion claim, the Court finds that a genuine issue of material fact exists as to whether all Defendants' actions were authorized by the Seed Agreement.  Accordingly, Defendants' Motion for Summary Judgment (Doc. 109) as to Plaintiff's conversion claim (Count III) is **DENIED.**

> ### d.       Plaintiff's Unjust Enrichment Claim (Count IV)

Before addressing the merits of Defendants' Motion for Summary Judgment on Plaintiff's unjust enrichment claim, the Court must address the choice of law dispute.  Plaintiff cites to Florida law in response to Defendants' Motion.  (Doc. 139 at 8).  Defendants argue that Georgia law governs Plaintiff's claim for unjust enrichment as the claim does not arise directly from the contract.  (Doc. 154 at 9).  The Seed Agreement contains a Florida choice-of-law provision.

When selecting the correct choice-of-law rule, a federal district court must apply the state law that would be applied by the state court of the state in which it sits.  This is true whether the basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332 or federal question under 28 U.S.C. § 1331.  *See* Bass v. First Pacific Networks, Inc., 219 F.3d 1052, 1055 n.2 (9th Cir. 2000); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 541 n.1 (2d Cir. 1956).  The Court therefore applies Georgia's choice-of-law rules to interpret the scope

of the choice-of-law clauses in the Seed Agreement.  "[I]n the absence of contrary public policy, our courts normally will enforce a contractual choice of law provisions, as the parties by contract may stipulate that the laws of another jurisdiction will govern the transaction." Nationwide Logistics v. Condor Transport, 270 Ga. App. 277, 280(2) (2004).  Defendants have not offered any public policy reasons that would foreclose the application of Florida law in this case.  As such, the Court will apply Florida law to resolve whether Plaintiff's unjust enrichment claim fails as a matter of law.  *See* Innovative Strategic Commc'n. v. Viropharma, Inc., 2012 WL 3156587, at *3 (M.D. Fla. Aug. 3, 2012) (applying contractual choice-of-law provisions to all contract claims and to unjust enrichment claim as a quasi-contract claim).

"In Florida, the essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that made it inequitable for him to retain it without paying the value thereof." Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1274 (11th Cir. 2009) (internal quotations and citations omitted).  "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008).

Defendants argue that the existence of an express contract between GFS and Plaintiff precludes an unjust enrichment claim against all Defendants.  Plaintiff asserts that its unjust enrichment claim concerns the conduct of Wingate in his individual capacity and GSP, as GSP was not a party to any agreement with Plaintiff, and Wingate in his individual capacity was not a party to any agreement with Plaintiff.  Plaintiff does not contend that the unjust enrichment claim cannot be asserted against GFS, due to the existence of a contract between GFS and Plaintiff.  As

the record reflects that neither GSP nor Wingate in his individual capacity are parties to the Seed Agreement with Plaintiff, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 109) on Plaintiff's unjust enrichment claim as to GSP and Wingate in his individual capacity (Count IV).  (*See* Doc. 124).

However, as there is no genuine issue of material fact that GFS is party to the Seed Agreement between Plaintiff and GFS, Plaintiff's unjust enrichment claim as to GFS fails as a matter of law.  *See* Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697 (Fla. Dist. Ct. Appl. 2008).  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 109) on Plaintiff's unjust enrichment claim as to GFA (Count IV).

### e.      Defendants' Tortious Interference with Business Relations Claim (Count I):

GCIA moves for summary judgment on Defendants' Tortious Interference with Business Relations claim.  GCIA asserts that Defendants' Tortious Interference claim fails because no evidence exists demonstrating that it has acted with malicious intent to harm GFS's business, drive GFS out of business, or harm GFS's future employment.  Defendants argue that GCIA's reason for not providing the certification tags was pretextual, "further evidencing GCIA's malicious intent in not issuing the certification tags."  (Doc. 146 at 9).

Under Georgia law, to establish a prima facie case for tortious interference with business relations, a plaintiff must show that the defendant "(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury."  DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1518 (11th Cir. 1989) (internal quotation marks omitted).

The Georgia Supreme Court has held that the term "malicious" or "maliciously" means any unauthorized interference or any interference without justification or excuse.  Luke v. DuPree, 158 Ga. 590, 596 (1924).  In the context of tortious interference with business, the term is to be construed liberally: The act is malicious when it is done with knowledge of the plaintiff's rights and with the intent to interfere with them.  Architectural Mfg. Co. v. Airotec, Inc., 119 Ga. App. 245 (1969). Personal ill will or animosity is not essential to a finding of malice.  Luke v. DuPree, *supra*.  Malice plus injury to business of itself does not, however, constitute the tort of wrongful interference with business. Rather, an independent wrongful act is required as well as an injury.  Keystone Metal Moulding Co., Inc. v. R & W Metals Co., 486 F.Supp. 813 (N.D. Ga.1980).  Georgia law also establishes that conduct is not improper for tortious interference purposes when the alleged tortfeasor is acting within rights it reserved in an agreement between the parties.  Life Care Ambulance, Inc. v. Hosp. Auth. of Gwinnett Cnty., 202 Ga. App. 864, 868 (Ga. App. 1992).

O.C.G.A. § 2-11-22, entitled "Labeling Requirements," sets forth the required information to be printed on the label of each quantity of seed sold.  O.C.G.A. §§ 2-11-22(f) and (g), which discuss vegetable seeds, both require "the name and address of the person who labeled the seed or who sells, offers, or exposes the seed for sale within this state" on the label.

O.C.G.A. § 2-11-23(a)(6) states that:

No person shall sell, offer for sale, expose for sale, or transport for sale any agricultural, vegetable, flower, tree, or shrub seed within this state…[r]epresented to be "certified seed," "registered seed," or "foundation seed," unless it has been produced and labeled in accordance with the procedures and in compliance with rules and regulations of a legally authorized seed certification agency.

The GCIA describes its regulations for certification of seeds in its booklet called "General Seed Certification Standards," found at its website, certifiedseed.org.[4]  Section XVI of the Standards is "Tags, Labels, and Bags," and sets forth the regulations and procedures for selling certified seed.  Section XVI(A) states, "All seed stocks when sold as certified seed shall have an official tag or label properly affixed to each container."  Section XVI(B) states that the "certification tag, attached to the bag, serves as evidence of the varietal purity and identity of the seed contained therein."  Due to the requirements of O.C.G.A. § 2-11-23(a)(6), Defendants are statutorily required to abide by GCIA's rules and regulations, including the above-mentioned regulation governing the issuance of certification tags in connection with certified seed.

Defendants allege that the malicious act was GCIA's failure to timely deliver the certified tags.  Defendants also assert that the act was malicious because no evidence exists demonstrating that ownership papers were necessary.  However, the statutory language and requirements of GCIA discussed above demonstrate that when GCIA refused to ship the tags, it was acting within rights it has reserved as the official seed certification agency for the State of Georgia, and Defendants all agreed to follow GCIA rules regarding seed.  (Doc. 118 at 19).  Accordingly, GCIA's act of refusing to issue the tags cannot be malicious, and Defendants' claim for tortious interference with business rights fails as a matter of law.  The Court **GRANTS** GCIA's Motion for Summary Judgment (Doc. 118) as to Count I of the Third Party Complaint.

### f.      Defendants' Fraud Claim (Count II):

GCIA asserts that no evidence exists to support any of the elements of a claim of fraud. The elements of fraud are 1) misrepresentation; 2) knowledge of falsity; 3) intent to defraud, i.e., to induce reliance; 4) justifiable reliance; and 5) resulting damage.  <u>King v. SAM Holdings, LLC</u>, 2012 WL 3527459, at *4 (N.D. Ga. Aug. 14, 2012).  Defendants allege that each element

---

[4] As the parties have cited numerous times to this booklet, the Court considers it as part of the Record.

exists.   However, Defendants simply state that "[t]hese [false] statements were made with scienter and designed to induce Defendants to act" without any evidentiary support.   As stated in Bryant v. Rich, 530 F.3d 1368, 1382 (11th Cir. 2008), Defendants cannot meet their burden of establishing a genuine issue of material fact by relying on self-supportive affidavits or bare and self-serving allegations.   Accordingly, the Court finds that no genuine issue of material fact exists as to the absence of false statements made with scienter and designed to induce Defendants to act.   The Court **GRANTS** GCIA's Motion for Summary Judgment (Doc. 118) as to Count II of the Third Party Complaint.

### g.        Defendants' Claim for Negligent Misrepresentation (Count III):

To state a claim for negligent misrepresentation under Georgia law, a claimant must properly allege the following essential elements: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Home Depot U.S.A., Inc. v. Wabash Nat. Corp., 314 Ga. App. 360, 367 (Ga. App. 2012).

GCIA asserts that no evidence exists to support the first two elements, citing to Joy McCraken's affidavit which states that she did not promise to overnight the certification tags to Defendants.   However, Defendants cite to Wingate's affidavit stating that Joy McCraken did promise to overnight the tags.   Accordingly, a genuine issue of material fact exists as to whether false information was provided to Defendants.   The Court **DENIES** GCIA's Motion for Summary Judgment (Doc. 118) as to Count III of the Third Party Complaint.

### CONCLUSION

Based on the foregoing, Plaintiff's Motion for Partial Summary Judgment (Doc. 111) is **GRANTED-IN-PART** and **DENIED-IN-PART**, Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and GCIA's Motion for Summary Judgment (Doc. 118) is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiff's claims for willful infringement against all Defendants and induced infringement against Wingate (Count I), breach of contract claim as alleged in the Amended Complaint against GFS (Count II), conversion claim against all Defendants (Count III), and unjust enrichment claim against Wingate and GSP (Count IV) remain in the case.  Defendants' Claim for Negligent Misrepresentation (Count III) against GCIA also remains in the case.  The case will be set for the January 2013 trial term by separate order of the Court.

**SO ORDERED**, __27th__ day of September 2012.

__/s/ W. Louis Sands_____
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT COURT**